# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 07-0774

**STATE OF LOUISIANA**

**VERSUS**

**WALTER R. COX, SR.**

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT,
PARISH OF CALCASIEU, NO. 8925-05
HONORABLE DAVID ALEXANDER RITCHIE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

**JIMMIE C. PETERS
JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses G. Thibodeaux, Chief Judge, Sylvia R. Cooks and Jimmie C. Peters, Judges.

**AFFIRMED IN PART, VACATED IN PART, RENDERED IN PART, AND REMANDED WITH INSTRUCTIONS.**

**John F. DeRosier**
**District Attorney**
**Carla Sue Sigler**
**Assistant District Attorney**
**1020 Ryan Street**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Mark O. Foster**
**Louisiana Appellate Project**
**Post Office Box 2057**
**Natchitoches, LA 71457**
**(318) 572-5693**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Walter R. Cox, Sr.**


**Walter R. Cox, Sr.**
**Camp D. Hawk 3/R**
**Angola, LA 70712**
**PRO SE**

PETERS, J.

The State of Louisiana (state) charged the defendant, Walter Cox, Sr., by grand jury indictment with the offenses of manslaughter, a violation of La.R.S. 14:31(A)(2)(a); aggravated obstruction of a highway of commerce, a violation of La.R.S. 14:96; and aggravated criminal damage to property, a violation of La.R.S. 14:55. A jury found him guilty of all three charges, and, thereafter, the trial court sentenced him to serve forty years at hard labor for the manslaughter conviction, fifteen years at hard labor for the aggravated obstruction of a highway of commerce conviction, and fifteen years at hard labor for the aggravated criminal damage to property conviction. The trial court ordered that the sentence imposed for the aggravated criminal damage to property conviction run concurrently with the sentence imposed on the manslaughter conviction, and that the sentence imposed for the aggravated obstruction of a highway of commerce conviction run consecutively to the other sentences. After the trial court denied his motion to reconsider his sentence, the defendant filed this appeal, contesting both his convictions and sentences. For the following reasons, we affirm the defendant's conviction and sentence for aggravated criminal damage to property, vacate the defendant's convictions and sentences for manslaughter and aggravated obstruction of a highway of commerce, enter a judgment of conviction of negligent homicide, and remand the matter to the trial court for sentencing on that charge. Additionally, we remand the matter to the trial court for it to comply with the notification requirements of La.Code Crim.P. art. 930.8.

## DISCUSSION OF THE RECORD

On March 19, 2005, while negotiating a curve on Louisiana Highway 12 in Calcasieu Parish, Louisiana, the defendant's vehicle struck another vehicle traveling

in the opposite direction. The driver of the approaching vehicle, Donna McKee, died as a result of the injuries she sustained in the accident. The collision causing the death of Mrs. McKee gave rise to the criminal charges against the defendant.

## ERRORS PATENT EVALUATION

Louisiana Code of Criminal Procedure Article 920(2) requires that all appeals be examined for errors that are "discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." In performing this examination of the record now before us, we find one such error.

The trial court failed to advise the defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. That being the case, we must remand this matter to the trial court with instructions to properly inform the defendant of the provisions of that article by providing him with written notice. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

## OPINION

The defendant's first three assignments of error relate to the sufficiency of the evidence presented in support of his conviction on each offense.

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to

2

affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The evidence establishes that on March 19, 2005, the defendant arrived at the Beauregard Parish, Louisiana residence of his son, Walter Cox, Jr., at approximately 11:00 a.m. He informed his son that he was fleeing from the police and needed money. His son instructed the defendant to meet him at a particular truck stop in Calcasieu Parish and said he would bring him some money. After the defendant left, Mr. Cox, Jr. telephoned law enforcement officials in an attempt to effect the peaceful surrender of his father at the truck stop.

The peaceful surrender did not materialize. Instead, the defendant drove away from the truck stop with law enforcement officers in pursuit. The high-speed chase that followed involved the defendant running stop signs, driving around police road blocks, and driving through residential neighborhoods at speeds approaching one hundred miles per hour. In fact, before the collision that gave rise to the charges now before us, the defendant had begun to outpace the officers in pursuit, partially because they had backed off from the chase due to safety concerns.

Officer Roger Thomas of the Calcasieu Parish Sheriff's Office testified for the state as an accident reconstruction expert. According to Officer Thomas, no evidence existed at the scene of the collision that either the defendant or Mrs. McKee ever lost control of their respective vehicles. Evidence did exist to suggest that Mrs. McKee attempted to avoid the collision by veering to her right, or away from the defendant's approaching vehicle, and that at some point prior to the collision the defendant turned his vehicle slightly left, toward the victim. This turn to the left resulted in a four-

3

degree angle of impact. Officer Thomas estimated the defendant's speed at the time of collision at approximately eighty-five miles per hour, and estimated Mrs. McKee's speed at approximately forty miles per hour.

With regard to the four-degree left, inward movement by the defendant, Officer Thomas acknowledged that it could just as accurately be described as a "drift" rather than a "turn" to the left. However, he discounted the possibility that this movement might have been caused by loss of control of the vehicle. Had that occurred, Officer Thomas opined, centrifugal force would have carried the defendant's vehicle to the right, not the left. Additionally, he did not credit the movement to the defendant overcorrecting by steering to the left. Had that occurred, he opined, one would have expected to find tire marks, i.e., "scuffing," or "slipping," left by such an action. No such marks were found at the scene.

James McKee, the victim's husband, was in the vehicle with his wife when the collision occurred. He testified that immediately before the collision he observed the defendant's vehicle approaching in their lane of traffic. According to Mr. McKee, his wife moved to the right to avoid the oncoming vehicle, but the defendant then turned his vehicle into theirs. Mr. McKee testified that in watching the collision unfold, he "felt like a target."

The defendant does not dispute the fact that he killed Mrs. McKee in the collision. Instead, he argues that the evidence does not support proof beyond a reasonable doubt that he committed any of the offenses.

### *Aggravated Obstruction of a Highway of Commerce*

We agree with the defendant that the state failed in its burden to establish that he is guilty of aggravated obstruction of a highway of commerce. Louisiana Revised

4

Statute 14:96 defines that offense in pertinent part as "the intentional or criminally negligent *placing* of anything, or performance of any act, on any . . . highway . . . wherein it is foreseeable that human life might be endangered." (Emphasis added.)

The offending act in La.R.S. 14:96 is the "placing" of something in a highway. The defendant did not place anything in the highway. Instead, he *drove* his vehicle on the wrong side of the highway, a violation of La.R.S. 32:71. We do not find that the act of driving in the wrong lane on a highway equates to placing something in that highway.

The defendant points out that no court has interpreted La.R.S. 14:96 to find that someone traveling in the wrong lane of traffic could be obstructing that lane as contemplated by that statute. The defendant further notes in his brief that to interpret La.R.S. 14:96 in the manner suggested by the state would make virtually all traffic offenses involving accidents violations of this statute—that is to say, felonies.

The case cited by the state, *State v. Winnon*, 28,654 (La.App. 2 Cir. 9/25/96), 681 So.2d 463, *writ denied*, 96-2576 (La. 3/27/97), 692 So.2d 391, does not support its position. In *Winnon*, the defendant "maneuvered his truck perpendicular to the direction of travel, obstructing the entire roadway, to block [the victim's] passage on the road", exited his vehicle, walked back to the victim's vehicle, and assaulted her. *Id.* at 465. In other words, he used the placement of his vehicle to create an obstruction of the highway.

Finding that the evidence does not support the defendant's conviction of aggravated obstruction of a highway of commerce, we vacate this conviction and sentence.

5

### *Aggravated Criminal Damage to Property*

Louisiana Revised Statute 14:55 defines aggravated criminal damage to property in pertinent part as "the intentional damaging of any . . . movable, wherein it is foreseeable that human life might be endangered, by any means other than fire or explosion." This offense requires only a general criminal intent. *State v. Davenport*, 33,961 (La.App. 2 Cir. 11/1/00), 771 So.2d 837, *writ denied*, 00-3294 (La. 10/26/01), 799 So.2d 1150. "General criminal intent is present whenever there is specific intent, and also the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act of failure to act." La.R.S. 14:10(2).

Mr. Cox, Jr. testified that when the defendant came to his home to ask for money, he said he needed the money to provide for himself. The defendant further told his son that he was willing to use violence to avoid capture, that he had no intention of going to jail, and that he would kill himself and anyone that got in his way. Mr. Cox, Jr. observed a pistol in his father's vehicle as the two men carried on their conversation. Additionally, the state introduced the defendant's written statement, through the testimony of Mr. Cox, Jr., wherein the defendant wrote, "I think every day about hitting a truck head on." When he contacted the authorities, Mr. Cox, Jr.'s primary goal was to effect his father's peaceful surrender. His concern was that, given the defendant's state of mind, a confrontation between him and law enforcement personnel would result in someone being injured or killed. Justification for this concern is clearly found in the defendant's actions after the police pursuit began. He placed in jeopardy not only the safety of the law enforcement personnel

and himself, but also the safety of entire neighborhoods and all of the motorists on the highways in the vicinity.

In addition to arguing that there was insufficient evidence to support the conviction of aggravated criminal damage of property, the defendant asserts another assignment of error: that the trial court erred in improperly limiting his questioning of Officer Thomas.

During Officer Thomas's testimony, the defendant's counsel attempted to question him concerning the possibility that the defendant's vehicle movement at the time of the collision resulted from inattention or over-correction and not an intentional act. In response, Officer Thomas stated the following:

> In order -- again, I go back to what I said earlier. If that is the case, -- you've got to remember, you have high speed on this vehicle. You have weight on this vehicle. You have tire slipping on this vehicle. You have a little -- you have a slight left curve. And if the vehicle starts one direction or the other, normally you're going to have tire slipping. And when you have tire slipping, you're going to have some types of marks. They may be just shadows, they may be just, you know, side slip marks, whatever, but you're going to have something you can go back and identify with. We looked closely for that. We didn't see any evidence of that. So, I don't -- I would not go with that theory.

When the defense counsel attempted to renew questioning along a "possibility" line, the state objected, asserting that the question had been asked and answered. After a lengthy bench conference involving a discussion of whether Officer Thomas's response that "I would not go with that theory" was a "yes" or "no" answer, the trial court sustained the state's objection. This ruling constitutes the substance of this assignment of error.

It appears that the defendant hoped, by this line of questioning, to make the point that it was possible for the defendant's tires to slip on the pavement without leaving marks. Earlier in the defendant's cross-examination of Officer Thomas, he

7

responded to a similar question by explaining that a number of factors play a part in the analysis of a vehicle's movement, including the physical makeup of the curve at issue, the speed and weight of the vehicle involved, gravity, centrifugal force, and coefficients of friction of the highway surface. According to Officer Thomas, had the defendant lost control because of excessive speed, inattentiveness, over-correction, or even temporary loss of consciousness, the vehicle would move to the right, not to the left. Additionally, Officer Thomas testified that, in such a situation, he would have expected to find evidence of tire slipping through the existence of tire marks. Thus, Officer Thomas had already discounted the point which defense counsel was attempting to make, and the issue had already been placed before the jury.

Louisiana Code of Evidence Article 611(A) provides:

> Except as provided by this Article and Code of Criminal Procedure Article 773, the parties to a proceeding have the primary responsibility of presenting the evidence and examining the witnesses. *The court, however, shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence* so as to:

> (1) Make the interrogation and presentation effective for the ascertainment of the truth;

> (2) Avoid needless consumption of time; and

> (3) Protect witnesses from harassment or undue embarrassment.

(Emphasis added.)

Although La.Code Evid. art. 611(B) provides that "[a] witness may be cross-examined on any matter relevant to any issue in the case," the supreme court has noted that "[t]he trial judge has discretionary power to control the extent of the examination of witnesses, provided the court does not deprive the defendant of his

8

right to effective cross-examination." *State v. Hawkins*, 96-766, p. 6 (La. 1/14/97), 688 So.2d 473, 479.

We find no abuse of the trial court's discretion in controlling the extent of examination of Officer Thomas. Furthermore, given the defendant's state of mind as established by his son's testimony, the testimony of Officer Thomas concerning the specifics of the collision, and the testimony of Mr. McKee concerning the defendant's actions in turning into the vehicle he occupied, we find that a rational trier of fact could have found that the state proved beyond a reasonable doubt the essential elements of the offense of aggravated criminal damage to property. Therefore, we find no merit in the assignment of error addressing the sufficiency of the evidence relating to this offense or the assignment of error relating to the defendant's cross-examination of Officer Thomas.

### *Manslaughter*

The defendant's manslaughter conviction is based on La.R.S. 14:31(A)(2)(a) which defines the offense as "[a] homicide committed, without any intent to cause death or great bodily harm . . . [w]hen the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person." In this case, the defendant was convicted of two felonies not enumerated in La.R.S. 14:30 and 30.1. However, in its instructions to the jury, the trial court stated that the underlying felony upon which the manslaughter charge was based was that of aggravated obstruction of a highway of commerce. Specifically, the trial court instructed the jury as follows:

> Thus, in order to convict the defendant of manslaughter, you must find:

9

(1) That the defendant killed Donna S. McKee whether or not he had an intent to kill; and

(2) That the killing took place while the defendant was engaged in the commission or attempted commission of aggravated obstruction of a highway of commerce.

The state voiced no objection to this limiting instruction and, in its closing argument, postured its position in light of the trial court's instruction, making no attempt to incorporate the aggravated criminal damage to property charge in its manslaughter argument. Additionally, after the jury had begun its deliberations, the trial court repeated its instructions concerning the manslaughter charge.

As previously stated, the state failed to prove beyond a reasonable doubt that the defendant committed the offense of aggravated obstruction of a highway of commerce. "A jury is not required constitutionally to agree on a single theory to convict a defendant *where it is instructed as to alternate theories*." *State v. Allen*, 41,458, p. 6 (La.App. 2 Cir. 11/15/06), 942 So.2d 1244, 1252, (emphasis added), (citing *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491 (1991) and *State v. Vergo*, 594 So.2d 1360 (La.App. 2 Cir.), *writ denied*, 598 So.2d 373 (La.1992)). *See also State v. Gay*, 36,357 (La.App. 2 Cir. 10/23/02), 830 So.2d 356 and *State v. Patorno*, 01-2585 (La.App. 1 Cir. 6/21/02), 822 So.2d 141. However, when the evidence is insufficient to establish an offense under the one definition of the offense that has been argued or presented to the jury, "the conviction cannot be upheld based on speculation about what verdict the jury would have returned if it had been informed of a different statutory basis" for establishing a defendant's guilt, and "[w]hen the prosecution chooses to limit its case in this fashion, a defendant cannot be convicted of [the offense charged] based on assumptions about what the jury would have found

10

if the prosecution had presented its case differently." *State v. Johnson*, 541 So.2d 818, 827 (La.1989).

Given the trial court's limiting instruction, the state's argument to the jury, and our finding that the conviction for aggravated obstruction of a highway of commerce must be vacated, we must also conclude that the state failed to prove beyond a reasonable doubt that the defendant committed the offense of manslaughter as set forth in La.R.S. 14:31(A)(2)(a). However, our analysis does not end with that conclusion. While we vacate the manslaughter conviction and sentence, we must now determine whether the trial evidence supports a conviction for a lesser and included offense.

"It is well-settled that in cases where Louisiana courts have reversed convictions for insufficiency of the evidence, they have authority to order the entry of convictions for lesser-included offenses where the records support such lesser convictions." *State v. Ruiz*, 06-30, p. 10 (La.App. 3 Cir. 5/24/06), 931 So.2d 472, 479, *affirmed and remanded*, 06-1755 (La. 4/11/07), 955 So.2d 81. In this case, negligent homicide, a violation of La.R.S. 14:32, is a responsive verdict to manslaughter. La.Code Crim.P. art. 814(A)(5).

Louisiana Revised Statutes 14:32(A) provides that "[n]egligent homicide is the killing of a human being by criminal negligence." Additionally, La.R.S. 14:12 provides that "[c]riminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances."

11

Without repeating the factual history, we can safely say that the record before us overwhelmingly supports a finding that the defendant killed Mrs. McKee by conduct that amounted to criminal negligence. That being the case, we find the defendant guilty of the responsive verdict of negligent homicide and remand the matter to the trial court for sentencing on this charge.

### *Confrontation Issue*

Next, the defendant complains that the trial court erred when it allowed a hearing to proceed without his presence. We disagree.

Shortly after the jury was sworn and seated, the defendant complained of chest pains. Outside of the presence of the jury, but in the presence of the defendant, the trial court announced that it would release the defendant to obtain medical care and would advise the jury (with instructions) that trial would be in recess until the next day. The defendant's counsel specifically waived the defendant's presence for these comments to the jury. Immediately thereafter, the defendant was transferred for medical treatment.

After the defendant left the court room, the trial court held a hearing wherein both the state and defendant's counsel questioned Walter Cox, Jr. to ascertain the nature of his trial testimony and to ensure he would not testify regarding "other crimes evidence." At the close of the hearing, the defendant's counsel stated that he waived the defendant's presence for this hearing and that he believed the hearing was in the defendant's best interest.

With regard to a defendant's presence or absence in a particular proceeding, the supreme court has explained:

> A criminal defendant charged with a felony has a right to be present "[a]t the calling, examination, challenging, impaneling, and

12

swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror. . . ." La.Code Crim. Proc. art. 831A(3); *State v. Hampton*, 99-2605, pp. 1-2 (La.5/28/99), 737 So.2d 699, 700. The rule is broader than an accused's due process right to be present at all stages of trial when his absence might frustrate the fairness of the proceeding. *Id.,* citing *United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985).

Yet the provisions of Article 831 are not absolute. In addition, an accused may waive his presence by voluntary absence, La.Code Crim. Proc. art. 832, or by not objecting to his absence from an Article 831A(3) hearing, as required under the general contemporaneous objection rule to preserve the matter. La.Code Crim. Proc. art. 841; *State v. Taylor*, 93-2201, pp. 4-7 (La.2/28/96), 669 So.2d 364, 367-69.

*State v. Broaden*, 99-2124, pp. 14-15 (La. 2/21/01), 780 So.2d 349, 360, *cert. denied*, 534 U.S. 884, 122 S.Ct. 192 (2001).

In this matter, it is clear that the defendant's counsel waived his presence and the defendant failed to object when he had the opportunity upon his return to the court. Thus, we find no merit in this assignment of error.

### *Sanity Commission Issue*

The defendant initially entered a plea of not guilty to the three offenses. Thereafter, he filed a motion for the appointment of a sanity commission to determine his mental capacity to assist his legal counsel in his defense. The trial court appointed a sanity commission and, after a hearing, rejected the defendant's argument that he was unable to assist his counsel in his defense. He now claims, by assignment of error, that the trial court erred in rejecting this argument.

This issue arose because the defendant sustained severe personal injuries in the March 19, 2005 collision. He asserted at the hearing on the sanity issue that he suffers from amnesia caused by the organic brain injury sustained in the collision, and that this condition precludes his ability to assist in his own defense. He based this argument on La.Code Crim.P. art. 641, which provides that "[m]ental incapacity to

13

proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him *or to assist in his defense*." (Emphasis added.)

The trial court heard testimony from both of the sanity commission members, Dr. James M. Anderson, a Lake Charles, Louisiana medical doctor board certified in psychiatry and neurology, and Dr. Charles Robertson, a Lake Charles, Louisiana neuropsychologist, on the issue of the defendant's capacity to assist in his defense. Additionally, the state introduced the written reports prepared by the experts. While both doctors generally expressed the opinion that the defendant could not assist in his defense, they also expressed their lack of comfort in the opinions expressed and suggested that access to other information might well affect their opinions.

Dr. Anderson testified that he examined the defendant for approximately one hour and found the defendant to be "knowledgeable, logical, organized, [and] coherent." According to the doctor, the defendant claimed to have no history of the events giving rise to his prosecution. He also stated that such a memory loss was not inconsistent with someone who suffered organic brain syndrome in an automobile accident. The doctor concluded that, assuming the memory loss claimed by the defendant, he would have difficulty in assisting in his defense in that this limited memory would make it difficult for him to "inform his attorney of distortion or misstatements of others," or "to assist his attorney in locating and examining witnesses." Despite these concerns over the defendant's ability to assist in his defense, Dr. Anderson testified that he would defer to the opinion of Dr. Robertson on that issue because Dr. Robertson "is well versed in organic brain syndrome and may have more and better information to provide on this [issue]."

14

Much of Dr. Anderson's concern in formulating his opinion arose from the defendant's ability to recall the events which occurred immediately before the vehicular pursuit and those immediately thereafter, but his inability to recall the pertinent facts related to the collision. According to the doctor, such selective memory is normally "a real indication of malingering." Still, Dr. Anderson found no evidence of that trait in the defendant. However, he also noted that the defendant was "well familiar with the legal system."

Dr. Anderson's written report corresponded to his testimony in all respects. Of the seven questions addressed to the doctor relative to the defendant's ability to understand the proceedings against him, Dr. Anderson answered only two in the negative. He found that the defendant was unable to recall and relate facts concerning his actions and whereabouts at certain times because of the defendant's claim that he could not recall those times. Additionally, and again because of the defendant's lack of recall, Dr. Anderson concluded that the defendant would not be able to inform his attorney when others distorted or misstated facts. In answering the remaining five questions, the doctor concluded that the defendant could assist his counsel in locating and examining witnesses, could make decisions in response to well-explained alternatives, could testify relevantly and be cross-examined at trial, could refrain from irrational behavior at trial, and could tolerate the stress of trial and the stress of awaiting trial.

Dr. Robertson also examined the defendant for approximately one hour. As a result of that examination he concluded that the defendant was not competent to stand trial based solely on his finding that the defendant would be unable to recall facts surrounding the collision, and therefore would be unable to assist his counsel in

15

"identifying witnesses and recognizing the misstatements of other witnesses." However, the doctor acknowledged that, in reaching that conclusion, he had to rely strictly on responses from the defendant. According to Dr. Robertson, the defendant could recall events that served his interest. Still, the doctor found the defendant to be believable and his responses to be consistent with his medical history of traumatic brain injury. Specifically, the defendant informed Dr. Robertson that he had been "in a motor vehicle accident, transported to a local hospital, treated and released to jail, and subsequent to that, the night of his incarceration, crashed, basically had to be taken to a New Orleans hospital for care for brain swelling."

Dr. Robertson testified that unconsciousness as a result of a brain injury would usually cause a thirty minute memory loss, but that the length of memory loss depends on "when the unconsciousness developed, how long it lasted, whether [the injured party] was unconscious at the scene and recovered consciousness, and then went unconscious again later on as the brain swelled." The doctor could not even be sure that those post-collision facts related to him by the defendant were facts he remembered or facts supplied to him by others during his recovery.

Dr. Robertson's written report addressed the same seven questions relative to the defendant's ability to assist in his defense as did Dr. Anderson's. In addressing the questions, Dr. Robertson concluded that the defendant would not be able to recall and relate facts pertaining to the collision because of his injuries, that he would not be able to assist in locating and examining witnesses for the same reason, that he could not maintain a consistent defense because he felt helpless in his inability to inform his attorney of the events of the collision, and that listening to testimony and informing his counsel of distortions or misstatements would be impossible because

16

of his absence of recall. Dr. Robertson concluded that the defendant could make simple decisions in response to well-explained alternatives, could testify in his defense, and could handle the stress associated with the trial. However, even these positive findings were subject to the loss of memory limitation. The report summarizes the doctor's findings as follows:

> Mr. Cox represents an unusual case in that he alleges traumatic brain injury with loss of consciousness, retrograde amnesia, and a period of post traumatic amnesia. He told me he was in a coma for 13 days and was in a hospital for 28 days. He said he was treated and released at sulfur hospital and transferred to the jail. Subsequent to that, he was transferred to New Orleans due to swelling of the brain. He alleges no memory for events from the March accident through late April. If his medical records bear this out, these conditions cannot be reversed. However, if he did not lose consciousness in the accident and did not appear to be altered in the emergency room, he may have memory for the events before his transfer to New Orleans. I would like an opportunity to review the medical records available pertaining to his injuries in the motor vehicle accident and his treatment in New Orleans to confirm the version he reported. This would be followed up by a subsequent examination at a later date.

Dr. Robertson summarized the reason for the discomfort on the part of both doctors as follows:

> As Dr. Anderson said he was uncomfortable or was unable to arrive at an opinion, and I was uncomfortable arriving at an opinion because I had only the hour I spent with the defendant to base my opinion on, and if I do, am provided subsequently with an independent record that I could follow up on that either confirms for or against the events related by the defendant. *I might revise that opinion.* But my opinion about his competency to stand trial *at present* is restricted only to his ability to testify and relate facts that are considered to be or that I believe to be a period of amnesia for him. That would be the only limit.

(Emphasis added.)

When questioned concerning what he meant by an "independent record," Dr. Robertson suggested that information from the officer at the scene or emergency personnel concerning the defendant's physical status, i.e., whether he was conscious

17

or unconscious at the scene, during transport to the hospital, or upon arrival at the hospital, would have been most helpful. Additionally it would have been potentially helpful to know whether he was questioned during these events and, if so, his responses to those questions.

In finding the defendant competent to assist in his defense, the trial court relied heavily on the experts' discomfort in rendering their decisions. Specifically, the trial court expressed concern with the experts' reliance on the defendant's recollection and found that Dr. Anderson's statement concerning selective memory as an indication of malingering to be applicable to the defendant's related history. That is to say, the trial court simply did not believe the defendant. Additionally, the trial court found no difference between the defendant's memory loss and that of someone whose memory loss can be related to intoxication, narcotics use, or blackouts or seizures. Given the experts' testimony concerning their desire to have more information upon which to base their opinions, the credibility of the defendant, and the trial court's experience in other cases wherein individuals developed selective memory relative to their criminal liability, the trial court rejected the defendant's argument that he was unable to assist in his defense.

The defendant bears the burden of proving his incapacity to stand trial. *State v. Stewart*, 03-920 (La.App. 5 Cir. 1/27/04), 866 So.2d 1016, *writ denied*, 04-449 (La. 6/25/04), 876 So.2d 832. However, the burden is preponderance of the evidence and not proof beyond a reasonable doubt. *Id.* In any event, the ultimate determination regarding competency is within the discretion of the trial court, and the reviewing court should not reverse that finding absent an abuse of that discretion. *State v. Bridgewater*, 00-1529 (La. 1/15/02), 823 So.2d 877, *rehearing on other grounds*, 00-

1529 (La. 6/21/02), 823 So.2d 909, *cert. denied*, 537 U.S. 1227, 123 S.Ct. 1266 (2003); *State v. Castleberry*, 98-1388 (La. 4/13/99), 758 So.2d 749, *cert. denied*, 528 U.S. 893, 120 S.Ct. 220 (1999).

In this matter, the experts' conclusion that the defendant could not assist in his defense was not unequivocal, and there is no evidence that the information they needed for a complete analysis was unavailable. Thus, the defendant failed in his burden of proof on this issue, and the trial court did not abuse its discretion in rejecting the defendant's claim that he was not competent to stand trial. We find no merit in this assignment of error.

### *Double Jeopardy Issue*

The defendant argues that his convictions for manslaughter and the underlying felonies violate the constitutional principle that bars double jeopardy. We find that this argument has no merit as to the conviction for aggravated criminal damage to property because the state based its manslaughter conviction on the underlying charge of aggravated obstruction of a highway. Additionally, our finding that the convictions for both aggravated obstruction of a highway and manslaughter must be vacated renders the balance of this assignment moot.

### *Sentencing Issues*

The sentences imposed for the three convictions were the maximum incarceration sentences allowable. La.R.S. 14:31(B), La.R.S. 14:55, La.R.S. 14:96. However, because we have vacated the convictions for aggravated obstruction of a highway of commerce and manslaughter, we need only consider the sentence imposed for the violation of La.R.S. 14:55.

19

The analysis for excessive-sentence claims is well-settled. In *State v. Barling*, 00-1241, 00-1591, (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, this court explained:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.

*Id.*, at 1042-43 (citations omitted).

To aid in this review, the courts have employed the following three-step analysis: "The court should consider three factors in reviewing a judge's sentencing discretion: 1. the nature of the crime, 2. the nature and background of the offender, and 3. the sentence imposed for similar crimes by the same court and other courts." *State v. Lisotta*, 98-648, p. 4 (La.App. 5 Cir. 12/16/98), 726 So.2d 57, 58, *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183 (citations omitted). Additionally, we note that maximum sentences should be reserved for the worst offenders. *State v. LeBlanc*, 578 So.2d 1036 (La.App. 3 Cir. 1991), *writ denied*, 620 So.2d 833 (La.1993).

In considering the factors set forth in *Lisotta*, we first note that the nature of the offense of aggravated criminal damage to property is of a serious nature in that it contemplates a situation "wherein it is foreseeable that human life might be endangered." La.R.S. 14:55. Furthermore, the record before us establishes that the defendant acted with complete indifference to human life.

Regarding the second *Lisotta* factor, we note that during the sentencing process the trial court found that not only was the defendant without remorse for his actions, but that his behavior and attitude reflected his personal contempt for the court and the witnesses, particularly Mr. McKee, despite having caused the death of the man's spouse. In addressing the evidence presented concerning the defendant's willingness to lose his own life rather than be taken into custody, the trial court noted that, assuming that evidence to be accurate, there existed no justification for placing so many innocent individuals in harm's way and that the defendant's actions were just another example of the defendant's lack of concern for anyone other than himself.

The trial court noted that the evidence established the defendant's criminal record to be long and significant. The defendant, who was sixty-four years old at sentencing, began developing a criminal record in 1960 with charges ranging from issuing worthless checks to first degree murder. The presentence investigation report reflects seventeen prior charges and three convictions: breaking and entering and larceny in Raleigh, North Carolina, in 1961; simple escape in Raleigh, North Carolina, in 1961; and manslaughter in Amite, Louisiana, 1969. The manslaughter conviction resulted from a plea agreement involving a first degree murder charge. While disposition records were apparently not available for most of the other charged offenses, the majority were violent in nature. In fact, at the time of the offense now before us, the defendant was fleeing apprehension for aggravated incest.

We conclude, as did the trial court, that the defendant is among the worst of offenders. With regard to the third *Lisotta* factor, our examination of the jurisprudence reveals no decisions on point. However, the record before us supports our conclusion that the trial court did not abuse its discretion in sentencing the

21

defendant to fifteen years at hard labor, the maximum sentence for the offense of aggravated criminal damage to property.

## *Pro Se Assignment of Error*

The defendant's pro se assignment of error relates to the trial court's instruction to the jury regarding manslaughter. This assignment has been rendered moot by our decision to vacate the manslaughter conviction.

## _____DISPOSITION

We affirm the defendant's conviction and sentence for aggravated criminal damage to property, vacate the defendant's convictions and sentences for manslaughter and aggravated obstruction of a highway of commerce, enter a judgment of conviction of negligent homicide, and remand the matter to the trial court for sentencing on that charge. Finally, we remand the matter to the trial court with instructions to inform the defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of the proceedings.

**AFFIRMED IN PART, VACATED IN PART, RENDERED IN PART, AND REMANDED WITH INSTRUCTIONS.**